IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
CA No.: 5:22-cv-00459-BO-RJ

| | | |
|---|---|---|
| OVIS MATAMOROS CANALES, on behalf of himself and all others similarly situated, | ) ) ) | |
| *Plaintiffs*, | ) ) ) | **SECOND AMENDED COLLECTIVE/CLASS ACTION COMPLAINT** |
| v. | ) ) ) | |
| OPW FUELING COMPONENTS LLC | ) ) ) | |
| *Defendant*. | ) ) ) ) | |

COME NOW, Ovis Matamoros Canales ("Named Plaintiff" or "Canales") on behalf of himself and all others similarly situated, (March 3, 2023, Decl. of Gilda A. Hernandez) (collectively "Plaintiffs") by and through undersigned counsel, and hereby sets forth this collective action for violation of the Fair Labor Standards Act under § 216(b), and a representative action under the North Carolina Wage and Hour Act pursuant to Fed. R. Civ. P. 23, and alleges as follows:

## PRELIMINARY STATEMENT

1. Named Plaintiff, on behalf of himself and all others similarly situated, brings this action against Defendant OPW Fueling Components LLC ("Defendant OPW" or "OPW") under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq*., and the North Carolina Wage and Hour Act ("NCWHA"), N.C. Gen. Stat. § 95-25.1, *et seq*., for not fully compensating employees who work or have worked at Defendant OPW.

2. Plaintiffs consist of current and former employees working in the manufacturing and operations department for Defendant OPW.

3. Despite notifying Plaintiffs of their non-exempt hourly status, overtime eligibility, hourly rates, promised bonuses, and shift differentials through an employee handbook and earning

statements consistent with the NCWHA, Plaintiff and others similarly situated were not always paid for all of their hours worked, (including time spent working through lunch breaks), promised bonuses, and either did not receive overtime premium at time and one-half for certain hours worked over 40 per week, and/or, did not receive the appropriate premium overtime rate because Defendant OPW did not incorporate all bonus earnings and/or shift differentials in determining the appropriate regular-rate for overtime compensation when Plaintiff worked in excess of forty (40) hours per week, in violation of the FLSA or the NCWHA, as applicable.

4.      Defendant OPW is aware of Plaintiffs working generally in excess of forty (40) hours per week as Defendant OPW has suffered or permitted, and in fact, required Plaintiffs to work in excess of forty (40) per week on a regular basis without being properly compensated time and one-half (1.5) for hours over 40 per week.

5.      Defendant OPW's practice of failing to compensate Plaintiffs at the appropriate promised straight time and overtime rates violates Plaintiffs' rights under either the FLSA and/or the NCWHA.

6.      Defendant OPW's pay practices and policies are in direct violation of the FLSA; and therefore Plaintiff, on behalf of himself, and all others similarly situated, seeks statutory overtime wages and the appropriate overtime premiums for all overtime work required, suffered, or permitted by Defendant OPW, liquidated damages and/or other damages as permitted by applicable law; attorneys' fees, costs, and expenses incurred in this action.

7.      Plaintiff brings this action for violation of the FLSA as a collective action, pursuant to Section 16(b) of the FLSA, 29 U.S.C. § 216(b), on behalf of the following class:

> All individuals who were, are, or will be employed at Defendant OPW's North Carolina facility on the manufacturing floor in non-managerial positions who were not compensated for all of their hours worked, including, but not limited to, above forty (40) per week any time within three years prior to the commencement of this

action, through the present.

8.     Defendant OPW is liable for its failure to pay Plaintiffs for all work performed, and at the appropriate overtime rate for hours worked in excess of forty (40) per week.

9.     Plaintiffs who elect to participate in this FLSA collective action seek compensation for all statutory overtime wages, an equal amount of liquidated damages, post judgment interest, and attorneys' fees and costs, pursuant to 29 U.S.C. § 216(b).

10.     Plaintiff also brings this action, on his own behalf, and as a representative of similarly situated current, former, or future manufacturing and operations employees, employed by Defendant OPW in North Carolina, under the NCWHA.

11.      Plaintiff, who is a North Carolina resident and who worked for Defendant OPW in North Carolina, asserts that he and the putative class, who works or worked in North Carolina for Defendant OPW, are entitled to compensation for all work performed for Defendant OPW, whether the workweek totaled greater or fewer than forty (40) hours, compensation at the appropriate regular or promised rate for hours worked less than 40 per week, and/or the promised and/or appropriate premium rate for all hours worked in excess of forty (40) per week, especially during workweeks when bonuses and/or shift differentials applied but were not included as part of the regular earnings for determining the appropriate premium rate(s), and/or bonuses that were promised but were unpaid, and for an equal amount of liquidated damages, prejudgment interest, and attorneys' fees and costs, pursuant to N.C. Gen. Stat. §§ 95-25.13, 95-25.6, 95-25.22(a), (a1), and (d). These promises are not enforceable under the FLSA, and thus the NCWHA is more stringent and provides greater protections to North Carolinians than the FLSA.

12.     Plaintiff seeks class certification under Rule 23 of the Federal Rules of Civil Procedure for the following class of Defendant OPW's employees in North Carolina:

Individuals who were, are, or will be employed at Defendant OPW's North Carolina facilities on the manufacturing and operations floor in non-managerial positions, were not compensated all promised, earned, and accrued wages due to Defendant OPW's policies, including, but not limited to, compensation for all hours worked up to forty (40) in a week and for hours worked above forty (40) in a week within two years prior to the commencement of this action, through the present.

13.     In addition, Named Plaintiff brings this action to remedy Defendant OPW's unlawful acts upon Plaintiff Canales exercising his rights under the North Carolina Retaliatory Employment Discrimination Act ("REDA'), N.C. Gen. Stat. § 95-240, for discriminating against Plaintiff following complaints regarding workplace safety and Defendant OPW subsequently terminating Plaintiff, in violation of REDA and North Carolina public policy.

14.     Accordingly, Plaintiff seeks all available relief for these claims, including, but not limited to, back pay, front pay, past pecuniary losses, prejudgment interest, compensatory damages, punitive damages, attorney's fees and costs, consequential damages, and all other relief permitted by applicable law.

## PARTIES

15.     Defendant OPW Fueling Components LLC ("Defendant OPW") is part of the Dover family, a diversified global manufacturer and solutions provider with annual revenue of approximately $8 billion that delivers innovative equipment, components, consumable supplies, aftermarket parts, software and digital solutions, and support services through five operating segments:  Engineered Products, Clean Energy and Fueling, Imaging and Identification, Pumps and Process Solutions and Climate and sustainability technologies. *See* opwglobal.com/company/about-dover.

16.     Defendant OPW Fueling Components LLC is organized under Delaware law and has its principal place of business at 9393 Princeton-Glendale Road, Hamilton, Ohio 45011.

According to its website, Defendant OPW has been leading the way in revolutionizing fluid handling operations globally since 1892.

17.     At all relevant times, Defendant OPW was an employer within the meaning of the FLSA, 29 U.S.C. § 203(d), the NCWHA, N.C. Gen. Stat. § 95-25.2(5).

18.     At all relevant times, Defendant OPW operated as an enterprise within the meaning of 29 U.S.C. § 203(r)(1).

19.     Named Plaintiff is an adult citizen and resident of the state of North Carolina, residing in Selma, North Carolina. Named Plaintiff worked for Defendant OPW as a machine operator and welder whose primary duties included operating various machines and welding as needed by Defendant OPW to reach production goals.

20.     The FLSA collective action Plaintiffs consist of individuals who have worked for Defendant OPW, who were paid an hourly wage, and who were not properly paid consistent with the FLSA's statutory overtime requirement.

21.     At all relevant times, Plaintiffs were employees engaged in commerce or in the production of goods for commerce within the meaning of 29 U.S.C. §§ 206, 207.

22.     At all relevant times, Defendant OPW has had gross operating revenues in excess of $500,000, consistent with 29 U.S.C. § 203(s)(1)(A)(ii).

23.     Plaintiff Canales brings this action on his own behalf and, pursuant to 29 U.S.C. § 216(b), as a representative of a proposed collective action of similarly situated employees.

## JURISDICTION AND VENUE

24.     This Court has original federal question jurisdiction under 28 U.S.C. § 1331 for the claims brought under the FLSA, 29 U.S.C. § 201, *et seq*.

25.     According to its website, Defendant OPW operates in North Carolina and maintains a business location at 3250 US Highway 70 Business West, Smithfield, NC 27577.

26.     The United States District Court for the Eastern District of North Carolina has personal jurisdiction because Defendant OPW conducts business in Johnston County, North Carolina, which is located within this District.

27.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), inasmuch as Defendant OPW conducted business within the Eastern District of North Carolina, and the substantial part of the events or omissions giving rise to these claims occurred in this District.

28.     The claims for violations of the NCWHA and REDA are based upon the statutory law of the State of North Carolina.

29.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the pendent state claims under REDA and the NCWHA because the state law claims arise out of the same nucleus of operative facts as the FLSA claims.

30.     All of the alleged causes of action can be determined in this judicial proceeding and will provide judicial economy, fairness, and convenience for the parties.

31.     The evidence establishing liability for the causes of action will be similar, and the state law claims will not predominate nor create confusion for a jury.

32.     Upon information and belief, during the period relevant to this action, Defendant OPW was an employer, joint employer, or member of an integrated, common enterprise, that employed Plaintiff, pursuant to REDA, in that Defendant OPW, or its agents, held or implemented the power, *inter alia*, to control the work performance of Plaintiff, and the Defendant OPW directly received the benefit of Plaintiff's labor.

## COVERAGE

33.    At all times material to this action, Defendant OPW acted, directly or indirectly, in the interest of an employer with respect to Named, opt-in, and putative Plaintiffs.

34.    At all times material to this action, Defendant OPW was an employer within the defined scope of the FLSA, 29 U.S.C. § 203(d).

35.    At all times material to this action, Named and putative Plaintiffs were employees within the scope of the FLSA, 29 U.S.C. §§ 206 and 207.

36.    At all times material to this action, Defendant OPW was an enterprise engaged in commerce or the production of goods for commerce as defined by the FLSA, 29 U.S.C. §§ 203(s), 203(r), in that said enterprise has had employees engaged in commerce or in the production of goods for commerce, or employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person, and in that said enterprise has had and has an annual gross volume of sales made or business done of not less than $500,000.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

37.    Defendant OPW primarily operates in the fluid-handling operations industry including to design and manufacture clean energy solutions, including loading systems, rail, and transport tank truck equipment, integrated flexible piping and secondary containment pumps, valves, fittings, underground and above ground storage tank equipment, spill containers, overfill prevention devices, swivels, breakaways, and fueling nozzles for virtually all fuel types, including gasoline, diesel, alternative fuels, LPG, Hydrogen and CNG.  Defendant OPW also designs and manufactures touch-free and friction car wash systems. OPW has more than 2,000 employees with manufacturing operations in North America, Europe, Brazil, China, and India, and sales around the world.  OPW is part of the Clean Energy & Fueling segment of Dover (NYSE: DOV). *See*

https://www.dovercorporation.com/; https://www.nyse.com/quote/XNYS:DOV.

38.     As stated, Defendant OPW has more than 2,000 employees at approximately 26 locations around the world. One of these locations is in North Carolina, which specializes in above and below-ground retail fueling.

39.     Defendant OPW employs machine operators, welders, and other manufacturing employees and has four departments, including the Retail Fueling sector.

## WAGE-RELATED FACTUAL ALLEGATIONS COMMON TO THE FLSA AND NCWHA

40.     Plaintiff Ovis Canales began work for OPW on or about October 19, 2011.

41.     Plaintiff Canales worked for Defendant OPW as a machine operator and welder. Plaintiff Canales operated a plasma machine.

42.     He would cut metals from plasma and weld them.  He made all of the types of pieces that are used in the gas stations, specifically the electrical systems in the gas pumps.

**Pay:**

43.     From 2019 to 2020, Plaintiff Canales earned $16.00 per hour. In 2020 Plaintiff Canales received a pay increase to $18.85 per hour. Plaintiff Canales's final pay rate was approximately $21.00 per hour.

44.     Plaintiff Canales was terminated on or about November 23, 2021.

**Work Schedule:**

45.     Plaintiff Canales worked an early morning shift, which was scheduled from approximately 5:30 a.m. to 2:00 p.m. Monday to Friday, with two (2) paid fifteen (15) minute breaks. On Saturdays, Plaintiff Canales was scheduled from 5:30 a.m. to 11:30 a.m. with one (1) paid twenty (20) minute break.

46.     On occasion, Plaintiff Canales worked under forty (40) hours per week, specifically during vacation time.

47.     Defendant requires employees working on the manufacturing floor to work scheduled shifts with a scheduled thirty (30) minute unpaid lunch break each day.

### NCWHA WAGE RELATED FACTUAL ALLEGATIONS

48.     According to the NCWHA "wage" includes bonuses and other amounts promised, including hours up to forty (40) each week, when the employer has a policy or a practice of making such payments. NC Gen. Stat. § 95-25.2(16).

49.     Defendant's failure to compensate for all properly recorded hours worked, including all work performed from the time Plaintiffs clocked in through the time Plaintiffs clocked out, work performed during lunch breaks up to forty (40) hours per week, and bonuses, and failure to pay employees all promised, earned, and accrued wages, has affected all putative Plaintiffs similarly.  Additionally, Plaintiff Canales and others similarly situated were promised premium pay for all hours worked at time and one half consistent with written policies as laid out in their handbook, (irrespective of OPW's statutory overtime obligation under the FLSA).

**Pre-Shift Work:**

50.     Sometimes, before the start of his shift, Plaintiff Canales was required to arrive between five (5) to ten (10) minutes early to check his machinery and put his equipment on. Plaintiff Canales was unable to clock in up until five (5) minutes before the start of his shift.

**Unpaid Lunch Breaks:**

51.     Although Plaintiff Canales and others similarly situated were required to be back in their department promptly within exactly thirty minutes, given the hazardous materials Plaintiffs handled, Plaintiff Canales and others similarly situated were required to thoroughly wash their

hands to remove any toxic material, including but not limited to fuel, and due to the location of the cafeteria, which was located relatively far from most workstations, the walking to get to and from the lunch room and standing in line to either clock out and back in, Plaintiffs lunch breaks did not constitute a full, uninterrupted thirty minutes. Indeed, Plaintiffs were penalized if they clocked in late from lunch.

52. Plaintiffs who clocked in too late or too early when returning from a lunch break accumulated half (1/2) a point as a penalty, with the accumulation of five (5) points resulting in termination.

53. Thus, Plaintiffs lunch breaks were between approximately fifteen (15) and twenty (20) minutes and thus should not have been automatically deducted from their workday.

**Bonuses:**

54. Defendant OPW promised to pay Plaintiffs a nondiscretionary bonus each time Plaintiffs work approximately more than sixty (60) hours per week beginning around October 2021. Defendant promised to pay a two-hundred- and fifty-dollar ($250) bonus each time Plaintiffs worked approximately more than sixty (60) hours in a week.

55. Plaintiff Canales and others similarly situated typically worked more than sixty (60) hours per week after the nondiscretionary bonuses were promised around October 2021. Despite working more than sixty (60) hours six times, Plaintiff Canales has not yet received two two-hundred- and fifty-dollar ($250) bonuses. When Plaintiff Canales did receive his bonuses, they were given on a monthly basis, despite being promised on a weekly basis.

56. Additionally, according to company policy, Plaintiff Canales would be eligible for an additional bonus every three (3) to six (6) months for refining his skills and providing recommendations to the company regarding how to improve their products, amounting to

approximately $600 to $700. Despite meeting the requirements, Plaintiff Canales regularly did not receive such additional bonuses.

**Vacation and Holiday Pay:**

57.     Defendant also promised to pay Plaintiff Canales for holidays and vacation time, which it failed to do. More specifically, Plaintiff Canales noticed in 2019 that two days were not paid during the week of Christmas.

## FLSA WAGE RELATED FACTUAL ALLEGATIONS

**Unpaid Overtime Hours:**

58.     Also, while Named Plaintiff's work schedule was 5:30 a.m. to 2:00 p.m., or 8.5 hours daily, Monday through Friday, Plaintiff Canales typically worked from 5:25 a.m. until 4:00 p.m. from October 2011 until around October 2021 (10 to 10.5 hours) each workday; from October 2021 onward Plaintiff Canales worked from 5:25 a.m. until 5:30 p.m. or 6:00 p.m. (12 to 12.5 hours) each workday; and on Saturdays from October 2011 until November 2021, Plaintiff Canales worked from 5:25 a.m. to 11:30 a.m., with no lunch break for a total of six (6) hours.  Thus, Plaintiff typically worked anywhere between fifty-nine (59) to sixty-nine (69) hours per week.

59.     As such, because Plaintiff Canales typically worked anywhere between fifty-nine (59) to sixty-nine (60) hours on a weekly basis, Named Plaintiff estimates that he was not properly compensated for a minimum of 3 hours per week, including but not limited to, the failure to augment Plaintiff's regular rate when he received additional earnings for bonuses or shift differential during overtime workweeks. Accordingly, Named Plaintiff is owed a minimum of $3,744.00 for one year in lost wages during the relevant time period.

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, RETALIATION, AND WRONGFUL TERMINATION FACTUAL ALLEGATIONS

60.     Named Plaintiff and the aforementioned Opt-in Plaintiffs worked for Defendant OPW at Defendant OPW's branch located in Smithfield, North Carolina.

61.     Prior to the pandemic, Defendant OPW held weekly administrative meetings to report important updates. During these meetings, the department supervisor, Armando Cholula ("Cholula"), and team leads, "Tomas" and Moises Mena ("Mena") were more concerned with improving production than addressing the safety concerns of the employees. Plaintiff Canales himself, along with Plaintiffs, repeatedly reported faulty machinery during these meetings. However, when Plaintiff Canales and other employees identified specific safety issues or malfunctions with the machines, the supervisors leading meetings would ignore their concerns.

62.     While Defendant employed machine technicians who were responsible for repairing machines, due to delays in technician repairs and to ensure Defendants' high production rates were met, management rarely called the technicians or reported the breakdown of the machines. Rather, the expected practice was for Plaintiffs to troubleshoot machines themselves, despite having no experience or training on how to troubleshoot machines whatsoever, to keep the machines running and avoid delays in production.

63.     After the pandemic, the aforementioned administrative meetings started taking place on a monthly basis. Plaintiff Canales and Plaintiffs continued to make complaints about the machines during these meetings to the various levels of supervisors; however, such concerns remained unaddressed and dismissed. In fact, after these meetings, Defendant continued to require Plaintiffs to repair their own machines, despite the inherent safety violations involved in such a practice.

64.     Plaintiff Canales and Plaintiffs also made complaints about the machines during group meetings that took place at the start of each shift. Present at these group meetings were plaintiff, putative plaintiffs and Rule 23 class members, team leads, Moises Mena, "Tomas," and Cholula, who was the department supervisor in charge of the team leads and machine operators.

65.     Although Named Plaintiff, putative Plaintiffs, and Rule 23 class members complained about the machinery to various levels of leadership within OPW, including reporting safety violations to the department supervisor, Cholula, Defendant OPW repeatedly failed to submit repair requests to machine technicians. It was common practice for management to refuse to submit requests for machine repairs because management claimed "it took too long" for technicians to repair the machines.

66.     In Plaintiff Canales's department, machine failures were common because the machines were old and in poor condition. Management, including Mena and Cholula, refused to replace machines even when informed by machine technicians that machines needed to be replaced and that the machines were injuring Plaintiffs.

67.     In Plaintiff Canales's department it was normal for management to ask Named and putative Plaintiffs to troubleshoot machines regularly.   Plaintiff Canales was one of these individuals who was asked to troubleshoot the machines.

68.     Due to Plaintiff Canales's knowledge of various machines, Plaintiff Canales was frequently pulled from his assigned station to render assistance in other stations. Cholula asked Plaintiff to repair the machines on at least two occasions.

69.     Plaintiff Canales initially refused orders from the department supervisor Cholula and team leads (such as Mena and Tomas) to troubleshoot the machines due to his concerns about the safety of the machines. However, when he would refuse to commit such safety violations,

Cholula would get angry, micromanage, yell, and berate Named Plaintiff. Plaintiff Canales eventually gave in after he faced several weeks of harassment.

70. In or about September 2021, Supervisor Cholula instructed Plaintiff Canales, Plaintiff, and putative Plaintiffs/Rule 23 class members in a meeting that they were not permitted to unilaterally make decisions without his input, and that employees were strictly forbidden from directing or advising other employees on how to do their job. In other words, Cholula made it clear that only he had the authority to supervise and direct employees on how to handle their own machinery. No other employee, including, but not limited to Plaintiff, could direct or instruct another employee on the handling of their own machinery.

71. Approximately one month before Plaintiff Canales was terminated, an incident occurred where Plaintiff Canales's co-worker, Narciso Solis ("Solis"), suffered a life-threatening accident due to faulty machinery.

72. On or about October 28, 2021, team leader Mena, at the direction of Supervisor Cholula, ordered Plaintiff Canales to assist Narciso Manuel Solis ("Solis") in operating his machine. Given fear of reprisal, Plaintiff complied because he knew that if he refused, his supervisor Cholula would retaliate against him, as he had done many times in the past when Plaintiff Canales refused unsafe orders.

73. When Plaintiff Canales went to help Solis with his machine, he noticed Solis was struggling with the machine. Solis informed Plaintiff Canales that the machine was down again. Plaintiff Canales observed Solis attempting to repair the machine, as it was customary for employees to do, in light of Defendant OPW's failure to give any credence to Plaintiff's complaints regarding the faulty machinery.

74.     When Plaintiff Canales noticed Solis was struggling to repair the machine, Plaintiff Canales mentioned they should contact a machine technician.  Solis continued to repair the machine himself because he, and all other Plaintiffs, understood that management expected Plaintiffs to troubleshoot and repair the machine themselves to keep production moving.

75.     Immediately before the incident, Solis directed Plaintiff Canales to go to an area by the machine and to press a button when commanded. Plaintiff Canales went to the other end of the machine with his coworker "Daniel," who regularly assisted Solis.

76.     Plaintiff Canales was unable to see Solis from where the buttons were located but recalls Solis placing a beam on the machine to fix the machine. Plaintiff Canales again, incredibly worried for their safety, and despite Defendant OPW's policy and/or practice that employees should repair the machines themselves, suggested to Solis they contact a technician, to which Solis stated, "No, I fix this machine  all of the time."  In other words, Solis customarily repaired the machine due to Defendant OPW's established practice of requiring employees to repair their own machines.

77.      Plaintiff Canales and Daniel were prepared to press the button on Solis's command, when Daniel instructed Plaintiff Canales to stop the machine because Solis had just had an accident. The beam that Solis had placed to repair the machine had activated the machine and caused Solis to suffer a terrible fall.

78.     Solis spent several months in critical condition from the accident before ultimately passing away on or about six (6) months later.

79.     Upon information and belief, Plaintiff Canales is aware Defendant OPW terminated Solis on or about one (1) month after the accident, and while Solis was recovering from his accident and terminating his health benefits.

80.     Following Solis's accident, Defendant OPW's machine technicians evaluated the machine and found an object had been lodged and/or stuck in the machine that caused it to not correctly work the day of the incident. In other words, had the machinery been evaluated by Defendant's machine technicians, Solis would not have been repairing the machine himself, and would not have suffered a terrible fall.  The technicians also determined that the machine should have been replaced long before the incident, as Solis's machine was beyond repair.

81.     After Solis was taken to the hospital, Defendant OPW ordered everyone to resume their workday as normal.

82.     One or two days after the incident, Plaintiff Canales was questioned by "Janie," the Human Resources ("HR") Assistant at Defendant OPW, and the Director of Safety and Operations Franklyn Terranova ("Frank") about the incident, under the guise that the information he provided would be used to prevent future accidents.

83.     Given the animosity and increased scrutiny Canales faced in the past after reporting safety violations to the Department Supervisor Cholula, Plaintiff Canales did not feel comfortable vocalizing the ongoing issues at OPW, in particular, that despite repeated complaints to management regarding the irreparable and/or faulty machinery, Defendant OPW, cared more about production and not the safety of its employees.

84.     In other words, had management taken Plaintiffs' complaints seriously, this accident would not have occurred.  More specifically, Plaintiff Canales feared that if he explained that Cholula had ordered him to assist Solis that Cholula and Defendant OPW would retaliate against Plaintiff, and he would lose his job. Because of this, Plaintiff Canales explained to Frank and Janie what had happened but did not mention that Cholula ordered him to assist Solis.

85. Nevertheless, Plaintiff had no other reason to be in Solis's department but for the fact that he was directed by management to assist Solis.

86. Approximately one week after the incident, Janie and Frank questioned Plaintiff Canales again. This time, they asked Plaintiff Canales why Solis had placed the beam that led to his fall and whether anyone instructed Solis to do so. Plaintiff Canales expressed to Frank and Janie that he would never tell Solis to put the bar there, *especially* given the explicit instructions from Cholula that machine operators were strictly forbidden from telling other machine operators what they could and could not do. Plaintiff Canales explained to Frank and Janie that Solis had tried to repair the machine himself because it was the practice of the company for employees to repair their own machines to avoid delays in calling and waiting for technicians.

87. Additionally, following these multiple conversations, Canales faced increased scrutiny in his work. Ultimately, it seemed as if Janie and Frank were not earnestly investigating the safety violations but rather wanted Canales to provide testimony that would help the company avoid any liability for Solis's accident. When Canales could not truthfully confirm the safety of the machines (but rather the opposite and mentioned the ongoing malfunctions and company's practice in requiring employees to repair their own machines), Defendant OPW sought to terminate Plaintiff as soon as possible to rid themselves of any potential evidence or witness who could contradict Defendant's denial of responsibility for Solis's injuries.

88. On November 23, 2021, one week before Plaintiff Canales was terminated, Frank and Janie questioned Plaintiff Canales *again*; this time accusing Plaintiff Canales of violating the safety policy. Frank and Janie told Plaintiff Canales that Solis's accident was his fault and that he was obligated to tell Solis to stop trying to repair the machine.

89. More specifically, Frank accused Plaintiff Canales of opening the window and acquiring the beam that severely injured Solis, despite Plaintiff Canales repeatedly stating this was not the case, and that Solis was in complete control of the machine. Plaintiff Canales informed Janie and Frank that Solis was already fixing the machine when Cholula had ordered Plaintiff to assist Solis, and that Plaintiff Canales had only pushed a button, as he was instructed to do.

90. About a week later Plaintiff Canales was called into the office. Rick Benson ("Benson"), the HR Director, Janie, and Joshua Smith ("Smith"), the Global Environmental Health and Safety Manager, told Plaintiff Canales that he was being terminated for violating the safety policy and that they were no longer in need of Plaintiff's services.

91. Despite the fact that Cholula ordered Plaintiff Canales to assist Solis with the malfunctioning of his machinery, (which Plaintiff Canales was not trained to do), Benson, Smith, and Janie informed Plaintiff Canales he was being terminated because he did not stop Solis from using the beam, which caused Solis's accident.

92. During this meeting, Benson, Janie, and Smith made it clear Defendant OPW was attempting to shift the blame on Plaintiff Canales for the accident of his co-worker and friend, even though it was unequivocally Defendant's practice of allowing employees to repair their own machines to avoid disruption in production that caused Solis's severe injuries.

93. Such accusation has caused Plaintiff Canales severe emotional distress, including depression, emotional trauma, repeated crying, and insomnia. Plaintiff Canales suffered anxiety and emotional distress resulting from the accusations from management and his resulting termination.

94. Due to financial constraints, Plaintiff Canales has not been able to seek counseling for the emotional trauma, insomnia, and depression.

18

95.     On or about June 1, 2022, Named Plaintiff filed an individual complaint with the North Carolina Department of Labor ("NCDOL"), charging Defendant OPW with unlawful retaliation under REDA. Said complaint was filed within 180 days of the last retaliatory act by Defendant.

96.     On January 18, 2023, the NCDOL issued Named Plaintiff a right to sue letter, attached hereto as Exhibit A.

97.     Named Plaintiff instituted a private lawsuit and filed the same within ninety (90) days of receipt of the NCDOL's right to sue letter.

## FLSA COLLECTIVE ACTION ALLEGATIONS

98.     Named Plaintiff brings the First Count of the instant Complaint as a collective action pursuant to 29 U.S.C. § 216(b), on behalf of himself and all similarly situated employees.

99.     Similarly situated employees, for purposes of the FLSA collective action claims, include individuals who were, are, or will be employed by Defendant OPW as manufacturing employees, at any time within the three (3) year period prior to the date of the commencement of this action, through the present, and who did not receive compensation for all hours worked, including bonuses promised for working more than sixty (60) hours per week.

100.    The members of the proposed collective action, like Named Plaintiff, are employed as manufacturing employees, have substantially similar job requirements and pay provisions, and are subject to common practices, policies, or plans that fail to compensate them for all work performed at the appropriate rate.

101.    Upon information and belief, there are hundreds of putative Plaintiffs and or similarly situated current and former manufacturing employees that fall within the scope of the aforementioned FLSA class.

102. The members of the proposed collective action are known to Defendant OPW, are readily identifiable, and may be located through Defendant OPW's records.

103. Pursuit of this action collectively will provide the most efficient mechanism for adjudicating the claims of Named and putative Plaintiffs.

104. Members of the proposed FLSA class, therefore, should be permitted to pursue their claims collectively, pursuant to 29 U.S.C. § 216(b).

105. Pursuant to 29 U.S.C. § 216(b), attached to and filed with the original Complaint as Exhibit B, is the Consent to File Suit as Plaintiff executed by Named Plaintiff. Dkt. 1-4. As this case proceeds, it is likely other individuals will file consent forms and join as opt-in plaintiffs.

106. Named Plaintiff requests that he be permitted to serve as representative of those who consent to participate in this action and that this action be conditionally certified as a collective action pursuant to 29 U.S.C. § 216(b).

## NCWHA CLASS ACTION ALLEGATIONS
## PURSUANT TO RULE 23 OF THE FEDERAL RULES OF CIVIL PROCEDURE

107. Named Plaintiff brings the Second Cause of Action of the instant Complaint as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of himself and all similarly situated employees, for relief to redress and remedy Defendant's violations of the NCWHA, N.C. Gen. Stat. § 95-25.1, et seq.

108. Numerosity: The proposed class is so numerous that joinder of all such persons is impracticable, and the disposition of their claims as a class will benefit the parties and the Court. While the exact number of class members is unknown to Plaintiff at this time, upon information and belief, the class comprises more than one hundred individuals.

109. Common Questions Predominate: There is a well-defined commonality of interest in the questions of law and fact involving and affecting the proposed class, and these common

questions of law and fact predominate over any questions affecting members of the proposed class individually, in that all putative class members have been harmed by Defendant OPW's failure to lawfully compensate them. The common questions of law and fact include, but are not limited to, the following:

  a. Whether Defendant OPW failed to compensate putative Class Members at the earned, accrued, and/or promised rate for all hours worked less than forty per week and in excess of forty (40) each week pursuant to § 95-25.6 and consistent with Defendant's handbook as required pursuant to § 95-25.13; and

  b. Whether Defendant OPW failed to compensate putative NC Class Members for all of their earned, accrued, and/or promised wages, including, but not limited to, straight time and overtime on their regular pay date, in violation of the NCWHA.

110. <u>Typicality</u>: The claims of Plaintiff are typical of the claims which could be alleged by any member of the putative class, and the relief sought is typical of the relief which would be sought by each member of the class in separate actions. All putative class members were subject to the same compensation practices of Defendant OPW, as alleged herein, of failing to pay putative class members for all hours worked at the promised hourly rate(s). Defendant OPW's compensation policies and practices affected all putative class members similarly, and Defendant OPW benefited from the same type of unfair and/or unlawful acts as to each putative class member. Plaintiffs and members of the proposed class sustained similar losses, injuries, and damages arising from the same unlawful policies, practices, and procedures.

111. <u>Adequacy of Representation</u>: Named Plaintiff is able to fairly and adequately protect the interests of all members of the proposed class, and there are no known conflicts of

interest between Named Plaintiff and members of the proposed class. Named Plaintiff has retained counsel who are experienced and competent in both wage and hour law and complex class action litigation.

112.    <u>Superiority</u>: A class action is superior to other available means for the fair and efficient adjudication of this controversy. Individual joinder of all class members is impracticable. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions engender. Because the losses, injuries and damages suffered by each of the individual class members may be small for some in the sense pertinent to the class action analysis, the expenses and burden of individual litigation would make it extremely difficult or impossible for the individual class members to redress the wrongs done to them. On the other hand, important public interests will be served by addressing the matter as a class action. The cost to the court system and the public for the adjudication of individual litigation and claims would be substantially greater than if the claims are treated as a class action. Prosecution of separate actions by individual members of the proposed class would create a risk of inconsistent and/or varying adjudications with respect to the individual members of the class, establishing incompatible standards of conduct for Defendant, and resulting in the impairment of class members' rights and the disposition of their interests through actions to which they are not parties. The issue in this action can be decided by means of common, class-wide proof. In addition, if appropriate, the Court can and is empowered to fashion methods to efficiently manage this action as a class action.

113.    <u>Public Policy Considerations</u>: Defendant OPW violated the NCWHA. Just as current employees are often afraid to assert their rights out of fear of direct or indirect retaliation,

former employees may also be fearful of bringing claims because doing so can harm their employment, future employment, and future efforts to secure employment. Class action lawsuits provide class members who are not named in the Complaint a degree of anonymity, which allows for vindication of their rights while eliminating or reducing these risks.

114.    Pursuit of this action as a class will provide the most efficient mechanism for adjudicating the claims of Plaintiffs and members of the proposed class.

<u>**COUNT ONE**</u>
**Violation of the Fair Labor Standards Act**
**Brought by Plaintiff on Behalf of Themself and All Similarly Situated Employees**

115.    Plaintiffs incorporate by reference all preceding paragraphs as if the same were repeated here verbatim.

116.    At all relevant times, Defendant OPW has been and continues to be, an "employer" engaged in interstate "commerce" and/or in the production of "goods" for "commerce," within the meaning of the FLSA, 29 U.S.C. § 203.

117.    At all relevant times, Defendant OPW has employed, and continues to employ, "employee[s]," including Named Plaintiffs, and each of the members of the prospective FLSA Class, that have been, and continue to be, engaged in interstate "commerce" within the meaning of the FLSA, 29 U.S.C. § 203.

118.    At all relevant times, Defendant OPW has had gross operating revenues in excess of $500,000.

119.    The FLSA, pursuant to §§ 206 and 207, requires each covered employer, including Defendant OPW, to compensate all non-exempt employees at a rate of not less than one and one-half (1.5) times the regular rate of pay for work performed in excess of forty (40) hours in a single workweek.

120.   At all relevant times, Defendant OPW, pursuant to their policies and practices, willfully failed and refused to pay for all hours worked to Plaintiffs, including for non-discretionary bonuses.

121.   Defendant OPW's failure to pay Plaintiffs for all hours worked, and at the appropriate overtime rate for hours worked in excess of forty (40) per week, in weeks where Plaintiffs worked over 40 hours, despite the fact that, upon information and belief, Defendant OPW knew of its obligations under the law, entitles Plaintiffs to liquidated damages in an amount equal to the amount of unpaid wages under 29 U.S.C. § 216(b), since Defendant OPW cannot show it acted in good faith, and a three (3) year, rather than two (2) year statute of limitations, since Defendant OPW's acts constitute willful violations of the FLSA, within the meaning of 29 U.S.C. § 255(a).

122.   As a result of Defendant OPW's unlawful acts, Plaintiffs have been deprived of compensation for all required hours worked, and appropriate compensation for all overtime hours worked, and are entitled to recovery of such amounts, liquidated damages, prejudgment interest, and attorneys' fees and costs, pursuant to 29 U.S.C. § 216(b).

123.   Plaintiffs and putative plaintiffs each worked more than forty (40) hours in one or more workweeks within the applicable statutory period.

**<u>COUNT TWO</u>**
**Violation of the North Carolina Wage and Hour Act**
**N.C. Gen. Stat. § 95-25.6**
**Brought by Plaintiff on Behalf of Themselves and All Similarly Situated Employees**

124.   Plaintiffs incorporate by reference all preceding paragraphs as if the same were repeated here verbatim.

125.   The class period for this cause of action is at least two years from the date of the filing of the initial Complaint. *See* Dkt. 1.

126.     At all relevant times, Defendant OPW has employed, and/or continues to employ, putative Plaintiffs and Rule 23 class members within the meaning of the NCWHA.

127.     Pursuant to the NCWHA, N.C. Gen. Stat. § 95-25.6, it is unlawful for an employer to "suffer or permit" an employee to work without paying all owed, earned, and promised wages, on the employee's regular payday.

128.     Additionally, North Carolina law requires every employer to notify employees of the promised wages and the day of payment as well as making available a written version of the employment practices and policies regarding promised wages. *See* N.C. Gen. Stat. § 95-25.13(1)-(2).

129.     Acceptable measures of providing employees information about promised wages include "an up-to-date employee handbook or other written statement of policies and practices with regard to promised wages" or through "payroll records, including check stubs, for wages promised in the form of hourly pay or salary or other form whose terms are readily identifiable from payroll records," and employers are required to pay such promised wages. Notification of Employment, 13 N.C.A.C. 12.0805 (2022).

130.     Additionally, "[a]n employee's signature on an employer's written notice of the promised wages which bears the date on which the employee was provided with the notice shall be presumptive evidence of the employer's notification in accordance with G.S. 95-25.13(1)." Notification at Time of Hiring, 13 N.C.A.C. 12.0804 (2022).

131.     Invariably, ***"[o]nce a promise is made by an employer, that employer must pay all promised wages, including wage benefits, accruing to its employees based on any policy, agreement or practice that the employer has established***." *See* North Carolina Department of Labor, *Promised Wages Including Wage Benefits*, https://www.labor.nc.gov/workplace-

rights/employee-rights-regarding-time-worked-and-wages-earned/promised-wages-including.

132.    Pursuant to the NCWHA, N.C. Gen. Stat. §§ 95-25.13 and 95-25.6, Defendant OPW was required to pay Plaintiffs and putative class members all wages, when due, for all promised earned and accrued regular, straight, and overtime wages of one and one-half times the promised wage rate, which is a part of all the employees' accrued and earned wages, and which should have been paid when due on the employees' regular payday; this requirement is not covered by the overtime provision under the FLSA. Moreover, the FLSA's Savings Clause pursuant to § 218(a) provides that employers should comply with the more stringent between the FLSA and state wage and hour laws.    Because the NCWHA provides for more stringent protections than the FLSA, the FLSA does not preempt the NCWHA.

133.    Every employer shall maintain complete and accurate records that document, in relevant part, the hours worked each workweek and all other records required to compute wages. 13 NCAC 12.0801.

134.    Defendant OPW intentionally refused to pay all wages due, including wages for all hours worked, as accurately recorded by Plaintiffs, and as set forth in the preceding paragraphs of this Complaint, to Plaintiffs and putative class members in violation of the NCWHA.

135.    Defendant OPW was aware that Plaintiffs and putative Plaintiffs were not receiving all straight-time wages for all hours worked up to forty (40) and overtime wages for hours worked in excess of forty (40) per week pursuant to the promised straight-time rate and corresponding premium overtime rate.

136.    Defendant OPW employed Named and putative Plaintiffs within the State of North Carolina.

137.    At all relevant times, Defendant OPW, pursuant to its policies and practices, failed

and refused to pay Plaintiffs all owed, earned, and promised wages, including for all work-related activities performed from the moment they clock in through the moment they clocked out, including, for example, required pre-shift work performed by Plaintiffs, and at the appropriate promised overtime rate that Plaintiffs are lawfully entitled to for hours worked in excess of forty (40) in a single workweek pursuant to the NCWHA.

138. Consistent with the above, Defendant's failure to pay Plaintiffs all owed, earned, and promised wages was in violation of N.C. Gen. Stat. § 95-25.6.

139. As a result of Defendant's unlawful policies and practices, Plaintiffs have been deprived of compensation due and owing.

140. Defendant's failure to pay Plaintiffs all owed, earned, and promised wages, despite the fact that, upon information and belief, Defendant OPW knew of its obligations under the law, entitles Plaintiffs to liquidated damages in an amount equal to the amount of unpaid wages, under N.C. Gen. Stat. § 95-25.22(a1).

141. Due to Defendant OPW's unlawful acts, Plaintiffs have been deprived of all compensation due under the law, and are entitled to recovery of such amounts, liquidated damages, prejudgment interest, and attorneys' fees and costs, pursuant to N.C. Gen. Stat. §§ 95-25.13, 95-25.6, 95-25.22(a), (a1), and (d).

<u>**COUNT THREE**</u>
**Violation of the North Carolina Retaliatory Employment Discrimination Act 29 N.C. Gen. Stat. § 95-240**
**Brought by Named Plaintiff on Behalf of Themself**

142. Plaintiff incorporates by reference all preceding paragraphs as if the same were repeated here verbatim.

143. Defendant OPW is a person within the meaning of N.C. Gen. Stat. § 95-240 (1).

144. Defendant OPW is an "employer" within the meaning of N.C. Gen. Stat. § 95-240.

145.    Filing a claim or complaint, initiating any inquiry, investigation, inspection, proceeding or other action, or testifying or providing information to any person with respect to the General Statutes is a protected activity under N.C. Gen. Stat. § 95-243.

146.    North Carolina law prohibits discrimination or retaliation against an employee for exercising rights protected under the North Carolina General Statutes. N.C. Gen. Stat. § 95-241(a). This includes making any discrimination or retaliation against an employee for reporting a violation of the North Carolina Occupational Safety and Hazard Act. N.C. Gen. Stat. § 95-241(a)(1) unlawful.

147.    By communicating with Defendant OPW, including not only their direct supervisor, but Defendant OPW's human resources personnel and corporate officials, and identifying their concerns related to Defendant OPW's unsafe and violative work environment, including addressing Defendant OPW's failure to adequately repair machinery and to provide safe, functioning machinery, Plaintiffs made clear the intent to initiate an investigation into Defendant OPW's violative practices and thereby engaged in protected activity. N.C. Gen Stat. § 95-241(a).

148.    The North Carolina Occupational Safety Hazard Act ("NC OSHA") adopts all occupational safety and health standards promulgated under the federal act. N.C. Gen. Stat. § 95-131.

149.    Employers are required to provide each worker "employment and a place of employment, which are free from recognized hazards that are causing or are likely to cause death or serious physical harm." 29 C.F.R. 654(a)(1); *see also* OSHA, *COVID-19 Standards*, https://www.osha.gov/SLTC/covid-19/standards.html (citing 29 C.F.R. 1910 Subpart 1, generally requiring gloves, eye and face protection, and respiratory protection when job hazards warrant).

150.    Named Plaintiff complained to management about the machines at least two times

per week. Machine failures were a common occurrence in Plaintiff Canales's department, and management was aware of the issue and that machines needed to be replaced and were beyond repair. Plaintiff Canales also notified management of the issues with the machine that caused Solis's injury. Named Plaintiff was terminated less than a month after this incident.

151. Named Plaintiff's complaints to management, including not only his team leads, Mena and Tomas, but also the department supervisor, Armando Cholula, as well as Alejandra Cobian Lopez, the Human Resources Specialist, were intended to initiate an investigation into the ongoing workplace safety issues, including the need of Defendant OPW to address the faulty machines Plaintiffs were required to use and repair in completing their duties.

152. Defendant OPW's hostile treatment towards Plaintiff Canales after Plaintiff Canales made these complaints, as well as the termination of Plaintiff Canales's employment was in violation of the Retaliatory Employment Discrimination Act ("REDA"), N.C. Gen. Stat. § 95-240 *et seq*.

153. As a proximate result of Defendant's conduct, Plaintiff has suffered damages, including, but not limited to, severe emotional distress, anxiety, mental anguish, and other compensatory damages.

154. Accordingly, Named Plaintiff is entitled to lost wages, lost benefits, and other economic losses as well as treble damages pursuant to N.C. Gen. Stat. § 95-243.

<div align="center">

**COUNT FOUR**
**Intentional Infliction of Emotional Distress**
**North Carolina Common Law**
**Brought by Named Plaintiff on Behalf of Themself**

</div>

155. Plaintiff Canales incorporates by reference all preceding paragraphs as if the same were repeated here verbatim.

156. The conduct of Frank, ratified by Defendant OPW, as alleged above, including, but

not limited to, blaming Plaintiff Canales for the accident that ultimately lead to the death of Solis and firing him for such, constitutes extreme and outrageous behavior, exceeding all bounds of a civilized society.

157.    The conduct of Frank, ratified by Defendant OPW, as alleged above, was intended to cause Plaintiff Canales to suffer severe emotional distress, or was carried out in reckless disregard as to whether it would inflict severe emotional distress upon Plaintiff Canales, or was certain or substantially certain to result in severe emotional distress on the part of Plaintiff Canales.

158.    The conduct of Frank, ratified by Defendant OPW, as alleged above, was foreseeable to cause, and did in fact proximately cause, Plaintiff Canales to suffer from severe emotional distress, mental anguish, humiliation, embarrassment, and pain, symptoms of which have manifested in mental and physical ailments, including depression, insomnia, and crying spells.  Such conditions have been severe and disabling to Plaintiff Canales's daily life, including, but not limited to, by limiting his ability to gain meaningful employment.

159.    Accordingly, Plaintiff Canales is entitled to compensatory damages under North Carolina law, and interest pursuant to N.C. Gen. Stat. § 24-5(b).

160.    These acts were committed by Frank while he served as an employee of Defendant OPW and while acting within the scope of his employment, and Defendant OPW further ratified Fran's behavior by taking no action to prevent it and firing Plaintiff Canales for not preventing the accident that ultimately led to the death of Solis.

## <u>COUNT FIVE</u>
**Wrongful Discharge in Violation of North Carolina Public Policy**
**North Carolina Common Law**
**Brought by Named Plaintiff on Behalf of Himself**

161.    Named Plaintiff incorporates by reference all preceding paragraphs as if the same were repeated here verbatim.

162.     It is the public policy of the State of North Carolina, as expressed in, *inter alia*, N.C. Gen. Stat. § 95-240, Article I, Section 1 of the North Carolina Constitution, and ubiquitously throughout the statutes and laws of this State, that employees be free from harassment, discrimination, and retaliatory treatment in their employment.

163.     Named Plaintiff participated in a legally protected activity by pursuing lawful employment with the expectation of having their constitutional and statutory rights respected and preserved by Defendant.

164.     The termination of Plaintiff Canales's employment, resulting from complaining about workplace safety violations, was wrongful as against the public policy of the State of North Carolina.

165.     Such termination proximately caused Named Plaintiff to suffer emotional distress and other losses, as described above.  Accordingly, Plaintiff Canales is entitled to compensatory damages under North Carolina law and interest pursuant to N.C. Gen. Stat. § 24-5(b).

166.     Defendant OPW's acts constituted willful, wanton, and malicious conduct, entitling Plaintiff to putative damages pursuant to Chapter 1D of the North Carolina General Statutes.

## **PRAYER FOR RELIEF**

WHEREFORE, Named Plaintiff, on behalf of himself and all those similarly situated, prays that this Honorable Court:

1.     Issue an Order certifying this action as a collective action under the FLSA, and designate Named Plaintiff as representative of all those similarly situated under the FLSA collective action;

2.     Issue an Order certifying this action as a class action under the NCWHA, and designate Named Plaintiff as representative on behalf of all those similarly situated under the

NCWHA class;

3. Award Plaintiffs and all those similarly situated actual damages for all unpaid wages found due, and liquidated damages equal in amount, as provided by the FLSA, 29 U.S.C. § 216(b), and pursuant to the NCWHA, N.C. Gen. Stat. § 95-25.22(a1);

4. Award Plaintiffs and all those similarly situated pre- and post-judgment interest at the statutory rate, as provided by the FLSA, 29 U.S.C. § 216(b), and pursuant to the NCWHA, N.C. Gen. Stat. § 95-25.22(a);

5. Award Plaintiffs and all those similarly situated attorney's fees, costs, and disbursements as provided by FLSA, 29 U.S.C. § 216(b), and pursuant to the NCWHA, N.C. Gen. Stat. § 95-25.22(d); and

6. Award Named and Opt-in Plaintiffs all wages, salary, benefits, or other compensation denied to or lost by Plaintiff, and monetary losses sustained, as a result of Defendant OPW's unlawful actions under REDA;

7. Award Plaintiff's interest at the prevailing rate, as provided under 29 U.S.C. § 2617(a)(1)(A)(ii) and N.C. Gen. Stat. § 95-243(c);

8. Award Plaintiffs all consequential damages due as a result of Defendant OPW's unlawful acts;

9. Award Plaintiffs punitive damages for Defendant OPW's willful, wanton, and malicious conduct;

10. Grant such further legal and equitable relief as the Court deems necessary and proper in the public interest.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands

a trial by jury on all issues so triable.

Respectfully submitted this April 04, 2024.

<div style="margin-left: 50%;">

*/s/Gilda Adriana Hernandez*
Gilda A. Hernandez (NCSB No. 36812)
Hannah B. Simmons (NCSB No. 59579)
Matthew S. Marlowe (NCSB No. 60035)
**THE LAW OFFICES OF GILDA A.**
**HERNANDEZ, PLLC**
1020 Southhill Drive, Ste. 130
Cary, NC 27513.
Tel: (919) 741-8693
Fax: (919) 869-1853
ghernandez@gildahernandezlaw.com
hsimmons@gildahernandezlaw.com
mmarlowe@gildahernandezlaw.com

*Attorneys for Plaintiff*

</div>

## CERTIFICATE OF SERVICE

I hereby certify that on April 4, 2024, I electronically filed the foregoing true and accurate copy of **SECOND AMENDED COLLECTIVE/CLASS ACTION COMPLAINT** with the Court using the CM/ECF system, and thereby electronically served the document to the following:

David I. Klass (NC Bar No. 53342)
Nicholas Hulse (NC Bar No. 54603)
Dixie McCollum (NC Bar No. 59629)
**FISHER & PHILLIPS LLP**
227 West Trade Street, Suite 2020
Charlotte, NC 28202
Telephone; (704) 334-4565
Facsimile: (704) 334-9774
dklass@fisherphillips.com
nhulse@fisherphillips.com
dmcollum@fisherphillips.com

*Attorneys for Defendant*

/s/Gilda Adriana Hernandez
Gilda A. Hernandez (NCSB No. 36812)
Hannah B. Simmons (NCSB No. 59579)
Matthew S. Marlowe (NCSB No. 60035)
**THE LAW OFFICES OF GILDA A. HERNANDEZ, PLLC**
1020 Southhill Drive, Ste. 130
Cary, NC 27513.
Tel: (919) 741-8693
Fax: (919) 869-1853
ghernandez@gildahernandezlaw.com
hsimmons@gildahernandezlaw.com
mmarlowe@gildahernandezlaw.com

*Attorneys for Plaintiff*

34